May it please the court, my name is Judith Wood. I represent the respondent, Mr. Park. This case presents a very dramatic scenario. Mr. Park was in Russia when he was declared to be a refugee by the UNHCR. This was in the early 90s. He had made the mistake, he didn't know the consequences, of listening to a recording from South Korea and because of that he was arrested in Russia and he was going to be deported to North Korea at which point eventually he tried to commit suicide and then the UNHCR basically rescued him and he was declared a refugee. At that point he really couldn't choose a country. The only place he could go was South Korea. What in the record suggests that he couldn't choose a country? The record suggests that he was asked where he would like to go and that he said he would go to South Korea. Well at that point in time the only country that was accepting North Korean refugees with a lot of duress was South Korea. Is that in the record? That the only country that was accepting North Korean refugees was South Korea? I don't remember seeing that in the record or any findings by the IJ to that extent. Everything that I read in the record suggests that he was that he said he was asked where he would like to go and he said South Korea. He may have chosen South Korea on account of the language. I wasn't there when he was asked. Okay but that's not but that's very very different from saying that he wasn't given any choices and that no other country would have accepted him other than South Korea. That doesn't feel like a fair representation of the record and the findings by the IJ. May I move on to the next point? Of course. Can I ask you just about the resettlement issue because I'm confused about one aspect. I thought that resettlement was an issue when you're claiming persecution in country A and you're now in the U.S. and you resettled in country B and the idea is well you can't claim persecution from country A when you resettled in country B. Why does resettlement have anything to do with this case when his claim is that he would suffer persecution in South Korea? So why does resettlement have anything to do with this? Am I missing something? Well he resettled in South Korea as a result of the fact that both South Korea and North Korea regard the peninsula of Korea to be one country and when a person arrives in South Korea they are considered to be a citizen of South Korea. They go through a training. They arrive at a place called Hanawon and then they are given some sort of training because as you know North Korea is a Marxist country and South Korea is a capitalist country so they receive some sort of training. In this case Mr. Park was not only admitted into South Korea but he was initially very badly treated during his interrogation in Hanawon. They beat him. They stripped him of his clothing. They intimidated him and they threatened to kill him. This went on for a matter of weeks but he was detained for six months. Then after he was released from Hanawon he was able to give speeches and he gave speeches throughout the time that he was in South Korea until finally he stopped. He refused to continue doing that and in these speeches he criticized the regime of North Korea and so he became visible to the people in South Korea and in South Korea there are a lot of North Korean dissidents, some of whom who have been also granted citizenship in South Korea. Mr. Lee was assassinated by such a dissident and so Mr. Park became very fearful for his own life. In addition he was not just an ordinary citizen in South Korea. He was published. His work was published. He was on TV and when he decided that he no longer wanted to give these speeches on TV he was threatened again. Even if we were to agree that he had shown past persecution in South Korea in the 1990s don't you need to further show that the IJ erred in finding that he did not face future persecution if returned to South Korea now? Well when there's a finding of past persecution the burden shifts to the government to show that the country conditions have changed and that was not done in this case. The government did not prove or even present evidence that South Korea is better now than it was then. That's not in the record. The government did not. So your position is that it would need to go back to the agency with the burden shift? Yes, Your Honor. This case presents a very humanitarian aspect insofar as this person has suffered severe psychological harm and he thinks, Mr. Park thinks, that if he's sent back to South Korea he will suffer number one assassination and if he's not assassinated he will suffer severe mental abuse and physical abuse and he's so fragile. He's very sick right now actually. He's suffered some, this is not in the record because it occurred later, but he has and he doesn't think that he can survive in South Korea at all for a number of reasons. The primary reason being that he was a political figure in South Korea insofar as he gave political speeches on television and was coerced into doing so. So I think that in this case you must remand it so that the judge can further adjudicate the issue of firm resettlement because he has not even though he was there for many years. Again, I go back to my earlier question. Why does resettlement matter if the country that he's claiming that he's concerned about persecution in is the country where he resettled? Well, this is how it works in immigration court, Your Honor. Usually a person from North Korea applies for asylum from North Korea and South Korea because he was born in North Korea. So he's also, and some judges give the benefit of withholding of removal to a national of North Korea. In this case, that didn't happen. And so a backup position is, well, you have to apply for asylum from South Korea as well. So he did. But his original application was also from North Korea. I see. But you're not claiming now that, you know, because there's no risk he's going to be returned to North Korea, that he's a refugee vis-a-vis North Korea. Well, not really claiming that because some people are returned to North Korea from South Korea. I don't know if that'll happen to him, but he's certainly terrified of that reality. Does the United States return anybody to North Korea? I don't have all the statistics on that, but I do know that the North Korean Human Rights Act of 2004, which was promulgated and then renewed in 2000, several years, the latest was 2012, says that the United States should not really look at refugees from North Korea as people who actually went to Congress and spoke to Senator Brownback. And there was a discussion about whether the North Korean Human Rights Act should apply, actually, to people who are coming from South Korea. Is the United States returning anybody to North Korea? Is there any evidence of that? I was under the impression that the United States did not return people to North Korea. Because of the North Korean Human Rights Act of 2004, we accept North Koreans. However, it's very difficult and very rare that a person comes here directly from North Korea. Okay. But the question was, is the United States returning anybody to North Korea? Is there any danger that the United States will return him to North Korea? I was under the impression that we do not return people to North Korea. It might be something else with them, but we don't return them to North Korea. Well, your impression is based on the fact that North Korea is a very horrific country that has a horrible human rights record. And we have passed the North Korean Human Rights Act. However, I don't have the statistics as to whether any North Korean has been returned to North Korea. I think the Judge Collins question, if there's no danger that we're returning him to North Korea, then the question of being firmly resettled in South Korea is irrelevant. Well, I wouldn't agree that there's no danger. Because in fact, if you return him to South Korea, South Korea could return him to North Korea. That would be the act of the United States though. That would be the act of South Korea. That is correct, Your Honor. So I'm just trying to figure out what U.S. law is here. I can't try to comprehend what South Korea law is. That's just too much for me. Well, South Korea will return people who they consider to be threats to South Korea. If they find that someone... But there's no evidence here that South Korea regards him as a threat or suggested that he might be returned to North Korea. No, but there is a suggestion in the record that he could be assassinated by other North Koreans. I understand that. But that's a question as to whether South Korea is prepared to protect him. Well, the thing is, can they protect him? Because other people in his situation, like his friend Lee, were assassinated. The question is, can they protect him? They may not be able to protect him. Do you have any evidence of any other assassinations of North Koreans in South Korea other than Mr. Lee? They're not in the record, but I have... So that means that in the last 25 years, we've got evidence of one. Well, other people have been assassinated. It's not in this record. But nothing's in the record. The one that's in the record is Mr. Lee. Mr. Lee, right. Is your claim of past persecution based on anything other than the treatment in the, what is it called, Hanawon facility where he was sent after he crossed the border? Yes. He was ordered, basically, to give speeches on television. And when he decided he didn't want to give these speeches, members of the South Korean government came to his apartment and beat him and threatened him. And this was after he was in the country? Way after he was released, several years later, yes. What is the date of the last incident in which officials of South Korea beat Mr. Park? I believe that it was in 1997, Your Honor. I keep my time for rebuttal. Yes. Good morning, Your Honors. May it please the Court. Alexander Lutz for the government. Your Honors, the one part of opposing counsel's presentation that I agree with is that if we look at the factors, if we look at the facts of what happened to Mr. Park in Russia and the treatment he would have faced if he had returned at that point to North Korea, the case absolutely does present sympathetic facts. But based on the record in this case, it does not support an application for asylum, withholding of removal, or camp protection with respect to South Korea. Can you answer this resettlement issue? Because there's, you know, tremendous discussion of resettlement and it struck me potentially as irrelevant. And am I wrong in thinking that if the only claim is that I face, I have a well-founded fear of persecution in South Korea, is it relevant whether he resettled in South Korea? Your Honor, I absolutely understand the point behind that question. But unfortunately, the best answer that I can give you is that we're limited to the decision that the agency actually rendered here. And the agency didn't look at that question. I don't think because it was raised. I think what the agency did is it adjudicated the claim that Mr. Park put forward and it said, you know, he claims firm resettlement doesn't apply. It applies. I see the point behind your question. I really do. But I'm not aware of a case and Mr. Park hasn't cited one that answers that question. It is odd for an alien. But you're not claiming that even if he faces a well-founded fear of persecution in South Korea, that he loses the ability to make that argument because he resettled in South Korea? No, Your Honor. I'm not arguing that. He absolutely has the opportunity to make a claim of a well-founded fear. So even if we found resettlement, that's not a grounds by itself for denying the petition for review? Your Honor, I'm not sure. I don't think there's a case that answers that question. And I see the point you're making based on the statute. The best I can tell you is that even if we set firm resettlement aside, the board indicated that based on the facts as found by the immigration judge, Mr. Park's asylum application with respect to South Korea. I understand. I just wanted to make sure. Is it a two-step ruling? Because the board seemed to think that at a certain level that the resettlement issue was dispositive on its own. But I don't see that. Even if he resettled, we're not done with the petition. We have to go on to address the other issues. Am I wrong in that? I don't think Your Honor's wrong. As I read the statute, I think that point makes sense. But again, the agency didn't find that. I haven't read a case saying that. So I feel like I'm going out a little bit on a limb here and saying that the whole firm resettlement analysis is just completely irrelevant. But it's indefensible, right? That the agency's... It's indefensible that he would lose his opportunity to contest asylum in South Korea because he's firmly resettled in South Korea. It makes no sense. I understand Your Honor's point. And no, that is right. So we have to assume that the resettlement point dealt with his claim that he didn't want to be returned to North Korea, where he probably wasn't in any danger of being returned anyway. Interestingly, Your Honor, yes, yes. I would agree with that, yes. The agency... It's the one way that the agency's decision makes sense. Otherwise, you're defending the indefense. I understand Your Honor's point. And that's right. And you know what? This Court has also held that if an alien suffers persecution in the country to which they would have... In the country to which they may have been firmly resettled, the firm resettlement bar doesn't apply because by definition, an alien who experiences persecution in country B is not firmly resettled in country B. So yes, the Court does have to look at that aspect of it. I'd like you to do it. I'd like you to address the persecution question. But before you get to that, I have a really off the wall question, but I want to get it out of the way now. I welcome it, Your Honor. Are there... Does he have any remedy because he's teaching at the DLI? I was sort of surprised to see him teaching in Monterey for the Defense Language Institute and not have had somebody from DOD sort of come to his defense and say, hey, this guy's really useful to us for a variety of reasons. Don't we have some kind of, I don't know, some Q visa or something that... You're a useful guy to the U.S. government, so you get to stay. Your Honor, I'm not aware of a visa like that. I think the argument he actually made is that that was a basis for him to receive asylum. Persecution, sure. I'm just trying to figure out whether there's any sense here, whether the DOD came to his defense and said, if there's anything you can do to keep this guy here, he is very useful to have in the United States. There's nothing like that in the record, and I'm not aware of a visa like that. But I would point out that the facts of this case actually show that he worked part time for a contractor that provided translation services that were used by the Department of the Army. So it's not as if he were working directly for the DOD, and to be honest, the record doesn't indicate if he's even still doing that job. So I am totally happy to answer the court's off-the-wall questions, but I don't think the facts would lead us in that direction. Can you address the point, suppose we think that the treatment that happened 25 years ago when he first arrived in South Korea in the mid-1990s, suppose we were to conclude that that did constitute persecution, past persecution, would that mean that it has to go back to the agency at that point to re-evaluate with the burden shifted?  Yes, it would, Your Honor. If the agency, if the court were to find that the record compels reversal on the question of past persecution, then under the ordinary remand rule, the case would have to go back to the agency for it to analyze the case with the burden on future persecution shifted to the government. Even though it was 25 years ago? Yes, Your Honor. That's just how the burden shifting and the regulation works. However, the record does not compel that conclusion based on the facts that are actually present here. Mr. Park, this... Before you go further on that, can you clarify, because there's some confusion between the Is this case governed by the Real ID Act? No, it's not. His application was filed before the Real ID Act came into effect. I noted that point in the opening brief as well, Your Honor. But if it pleases the court, I would like to turn to the question of past persecution because the court is confronted with a question of whether any reasonable fact finder would have to find past persecution on this record. And the facts that are actually in the record just can't support that holding. This case is distinguishable in a number of ways. If the Real ID Act doesn't apply, does the record doesn't compel a contrary conclusion standard apply? I thought that was part of the Real ID Act. I think the Real ID Act codified a substantial evidence standard that came from prior Supreme Court cases, Your Honor. That was in, gosh, I'd have to think, Cardozo, Fonseca, Elias, Zacharias. I can't remember exactly which case it was. But that standard was just codified. It was still applied prior to the Real ID Act under Supreme Court precedent. So that standard- It came from Elias Zacharias. Excuse me, Your Honor? I think it came from Elias Zacharias. I'll absolutely yield to Your Honor's recollection on that. And either way, I'm sure that that case predated the Real ID Act by decades. So that standard absolutely does govern here. And under that standard, this record would not compel reversal. Mr. Park did not experience economic deprivation where he lost a job like the facts in the He didn't suffer a persecutory restriction on his liberty. He wasn't detained in order to force him to do something, to stop practicing a religion, to live his life in a certain way. He was not subjected to physical harm that would rise to the level of past persecution. He was slapped or kicked, the record's not clear which, but twice in the first two weeks of his 10 years almost in South Korea. And then on one other occasion, he was slapped by a police officer when he asked to stop giving speeches. And here I feel I really do need to correct, I need to be clear on what the record supports. And I want to push back a little bit against opposing counsel's characterization of what the facts actually are with respect to this incident. Mr. Park testified that he was asked to give speeches for one year. He had about 10 speeches a month. That's at page 509 of the record that he says he was asked to give these. And he didn't mind giving them at first because he wanted to speak to South Koreans on what the reality of what goes on in North Korea. That's a direct quote, pages 514 and 552. He was paid for these speeches. And as time went on, he grew more pessimistic. That's his word about them because he felt like he was getting an unwelcome reception from students in his audience. So on one occasion, he said, you know, I don't want to go out there. I don't want to give the speech. He had two police officers with him at the time as part of, I want to say, a protective detail. Mr. Park's expert witness and he himself testified that these police didn't drive to his house and beat him. They were with him the whole time. One of them was a protective officer to keep him safe. These officers were supporting him financially, watching how things went on in his bank account. Because, as Mr. Park's own expert witness testified, North Koreans who arrive in South Korea are often overwhelmed by the difference in those two societies. They have trouble using ATMs, using buses and things. So these officers were around him to help him acculturate and to protect him. And when he said, I don't want to give these speeches anymore, one of the officers said, I'm seeking early retirement. And if you stop giving these speeches, I'm going to get fired. And he slapped Mr. Park. And the other officer broke in and said, stop doing that and tried to stop the beating. And Mr. Park was then asked, well, did you report this? And he said, no, a superior officer already knew about it before I even filed a report. And the superior officer came and he took me out to lunch. He said, what happened? You know, where did this, why do you want to stop giving speeches? And Mr. Park didn't ask at that point to stop. He said he wasn't angry anymore. You know, he felt like maybe he should just keep going. So the superior officer didn't force him to keep giving the speeches. Mr. Park just didn't ask at that point to stop. So we finished out the year tour of speaking and that was it. So other than two slaps or kicks in the first two weeks of his time in South Korea and that one incident, that's all the physical harm he suffered. This camp that Northern Korean refugees are sent to, what does the record show about that? How long he was there and what happened there? Well, Your Honor, the camp you're talking about is called Hanawon. And the record indicates, this is Mr. Park's expert witness's testimony, that by about 1999, the process of receiving North Koreans into South Korea had been more formalized. And eventually, that program was called Hanawon. And there are very favorable facts about that in the record. But it wasn't called that at the time Mr. Park got into South Korea in 1994. At that time, the process was a little bit less formalized because this was such a new phenomenon. The record shows that in 1994, North Korea and South Korea were at the end of a nuclear crisis. Only about 1,000 refugees had made it in. And most of them were not low-level defectors, as Mr. Park's own expert witness referred to him. And so under those circumstances, and prior to the formalization of the Hanawon process, Mr. Park was held and investigated for six months to determine whether he was a spy. And the expert witness said that was, and I quote, a legitimate concern. Spies had come in from North Korea prior to that as refugees. And Mr. Park himself concedes that that was the point of his being held in this facility for six months. Six months. Exactly. It's a long detention, Your Honor. But it wasn't a punitive detention. And the conditions of it were not as harsh as we've seen in other facts where this court has held a record to compel a conclusion of persecution. He wasn't held there to coerce him into doing anything. He wasn't held there and subject to repeated mistreatment. He was slapped twice in the first two weeks. But the other facts show they were just trying to root out a national security problem. They hooked him up to a lie detector and asked him, what are you going to do here? Do you have anything you have to do here? Do you have any mandate here? Are you a spy? They asked him to fill 100 pages with facts about his past. Who are you? Where do you come from? Who are your family members? They were looking for a national security threat. This court has, you know, I think is kind of analogous to this court's holdings that prosecution or force of military service don't necessarily equal persecution. This is not for a persecutory purpose. It was for a legitimate national security purpose. The conditions under which he were detained were not sufficiently harsh to constitute persecution. Other than that, his only claim in the briefs and I guess now an argument of past persecution are that he didn't like having these police officers shadow him. But the record shows that was to protect him and to acculturate him. Why did they select him to go around and give speeches and follow him around? Because he had a high level of education, Your Honor. That's I think at 514 or 509, I can't remember which. But he was one of a handful of refugees at that time who had a high level of education. And that's why he was picked to do this along with one of a few other refugees. But again, being asked to give speeches and being paid to do it is not persecution. And the fact that an officer slapped him when he asked to stop, I mean, that certainly shouldn't have happened. But that fact has to be weighed. This is a totality of the circumstances analysis. And it has to be weighed against the other conditions of his residence there. He was there for almost 10 years. He held multiple jobs. He earned money. He was allowed to live where he wanted in an apartment in Seoul. He married. And I use that word with air quotes because there was some discussion of whether it was a legal marriage. But either way, he took a partner there. They had a child. He had the opportunity to leave South Korea and did so three times. And every time he came right back. And he testified that it wasn't until 2003 that he formed an intent to want to leave the country. And he said, and I'm quoting now from a declaration at page 1427 of this lengthy record, I fled because of hostility and cynicism by South Korea. No one was sympathetic. And I certainly feel some sympathy toward Mr. Park for having felt that way. But that's not past persecution. That's not a fear of future persecution. This record just simply could not support, under the substantial evidence standard, holding that a reasonable fact finder could look at this record and only find that Mr. Park suffered past persecution or well-founded fear of future persecution. And those same facts really resolve the outstanding Convention Against Torture claim as well. But to the extent the court even feels it necessary to reach that last issue, the CAT claim, I would just point out one fact, which is that at page 747 of the record, Mr. Park's South Korean government would acquiesce in torturing him at this point, which really undercuts that entire claim. You have to have acquiescence for a CAT claim. And Mr. Park's conceded through counsel on the record that he doesn't meet that element. Thank you, counsel. Thank you, Your Honors. Just for the record, the case that counsel mentioned, Cardozo-Vanceca, very important immigration case, says if someone has a 10 percent likelihood of being persecuted in his or her country, then that is enough for asylum. I believe that Mr. Park has proven that he does have a 10 percent because he was detained. He suffered physical abuse. He was slapped by the police. Also, matter of SP, BIA decision, published decision, stands for the proposition that maybe one of the grounds was permissible. I mean, one of the reasons for subjecting Mr. Park to the abuse that he suffered in Hanawon was permissible insofar as it was an investigation. However, they went beyond that and they threatened him with death. So the combination of the physical abuse, being naked in a foreign, it's a foreign country to him, South Korea, having just been rescued from committing suicide and being and then being subjected to this horrific treatment, while it didn't last forever, it lasted long enough to make an indelible impression on his psyche, together with threats of killing him. They said, we'll kill you and no one, the birds or the mice, will not know that you're dead. That's enough for a finding of persecution, definitely according to Cardozo-Vanceca and matter of SP. I submit, Your Honor, that this case must be remanded. Thank you. Thank you, Counsel. The case just argued will be submitted.
judges: Schroeder, Bybee, Collins